BURRITT MUTUAL SAVINGS BANK OF NEW BRITAIN *v.* CITY OF NEW BRITAIN

COURT OF COMMON PLEAS    HARTFORD COUNTY    FILE No. 67217

Memorandum filed January 13, 1958.

*Harold J. Eisenberg,* of New Britain, for the plaintiff.

*George Coyle,* corporation counsel, and *Paul G. Cavaliere,* assistant corporation counsel, both of New Britain, for the defendant.

KLAU, J. This is an appeal from the refusal of the board of tax review of the defendant city to reduce the tax assessment on the list of September 1, 1956, on the plaintiff's land and building located at 267-271 Main Street in the city of New Britain.

The building in which the plaintiff conducts its savings bank business is a modern one, having been erected in 1949. The land in question has a frontage of approximately 43.5 feet on Main Street and is approximately 90 feet in depth. In addition, there are easement or passway rights on land of others over which entrance may be gained to the rear of the plaintiff's building.

The assessors of the city found the fair market value of the land on September 1, 1956, to be $182,866, of which $4137 was the value of the easement and $178,729 the value of the parcel itself. The front foot value of the subject property, based on a depth table standard of a lot 100 feet in depth, was established by the assessors at a market value unit price of $4137.24 per base front foot. This sum of $4137.24 was a slight adjustment of approximately $2.70 per foot from the fair market value of $4200 per front foot for a parcel having a standard depth of 100 feet which the assessors had established as the fair market value of land immediately adjacent and to the south. This market value of $4200 per front foot was established and accepted by the assessors on September 1, 1956, upon the recommendation of J. M. Cleminshaw Company, which had been engaged by the city in 1955 to make a revaluation of the entire real and personal property of the city for the grand list of September 1, 1956. This revaluation was conducted for the city by Richard Nesser, an employee of the J. M. Cleminshaw Company, whose findings and opinions were accepted in this case in toto by the board of assessors. Nesser's experience had been derived entirely from his employment of fourteen years with the Cleminshaw Company, and by research and a study of appraisal methods. He had never been in the real estate business or participated in real estate investments and mortgage financing.

In this case we are concerned with the question whether the $4200 per front foot valuation, adjusted to the subject premises by the slight variance downward, previously described, to $4137.24 by reason of its location a short distance northerly from the corner of Church and Main Streets and the northerly wall of the New Britain Trust Company building, is in fact representative of the fair market value of the subject premises.

The basic valuation of $4200 per front foot is the highest land valuation in the city of New Britain. It was the front foot rate established on September 1, 1956, in the so-called 100 per cent business district, which runs southerly from the corner of Main and Church Streets on the east side of Main Street to the Fair Department Store, and runs northerly from said corner to and including Grant's Department Store. Southerly from the corner of Main and Church Streets, the valuation, including the New Britain Trust Company building, which is located on that corner, was uniformly $4200 per front foot and was adjusted to a greater amount as the depth increased beyond 100 feet, in accordance with a depth table submitted in evidence. Northerly there was an adjustment downward for a distance of 141 feet along the east side of Main Street from the northerly wall of the New Britain Trust Company, which also constitutes the southerly wall of the subject property, to the end of Grant's Department Store. At the latter point the front foot price had decreased to $3800. The adjustment downward was due to a feeling that there was a slight decrease in the 100 per cent valuation. Plaintiff's property is located between the New Britain Trust Company building on the south and the so-called Lerner building on the north, with common party walls.

The front foot valuation of the plaintiff's land, having been first adjusted downward from $4200 to $4137.24, was further adjusted to $3971.75 in accordance with a depth table. The 90-foot depth was computed as having a 96 per cent comparative value to that of a standard lot 100 feet in depth. The amount of $3971.75, therefore, represents 96 per cent of $4137.24. The total land value was thereafter computed on a 45-foot frontage as having a fair market value of $178,729 plus $4137 for easement rights.

The fair market value of the building on September 1, 1956, was found by the assessors to be $235,497.

In the course of the trial, the plaintiff withdrew its objections to the failure of the board of tax review to reduce the valuation placed upon the building and confined its appeal solely to the issue of fair market value of the land and the tax assessment based thereon.

It was stipulated between the parties that the uniform percentage for tax assessment purposes prevailing and used by the assessors on the list of September 1, 1956, was 60 per cent of the fair market value. Such practice of assessing at a uniform rate less than 100 per cent of the fair market value of real property has been validated by the General Assembly in its 1957 general session; Public Acts 1957, No. 673, § 1; though declared illegal prior to such enactment by the Supreme Court of Errors. *E. Ingraham* v. *Bristol,* 144 Conn. 374.

Though the land in the instant case is occupied by the bank building, the parties are in agreement that the highest and best use which could be made of the parcel is for retail business purposes. Hence, the issue in this case is the fair market value of the land if it were devoted and utilized for its highest use and to its best purpose. Based upon such use, the plaintiff's expert claimed that the land had a fair market value on September 1, 1956, of $108,000. The contention of the city, based on the findings of Nesser, as has already been stated, was that its fair market value on that date was $178,729, plus $4137 for the passway rights, or a total of $182,866. Both of these opinions were based almost entirely on the method of determining market value known as capitalization of stabilized net income. *Sibley* v. *Middlefield,* 143 Conn. 100, 107; *Lomas & Nettleton Co.* v. *Waterbury,* 122 Conn. 228, 232, 233. This is a method

of determining value by capitalizing the future net incomes to be expected from a building devoted to the highest and best use of the land at a capitalization rate which provides for both a return on the investment and a recapture or amortization of the investment, also termed depreciation, over the period of the economic life of the building.

There are three residual methods of capitalizing income into value. The first, known as the land residual process, capitalizes the amount remaining from the gross income, in order to determine the land value, after proper allowance has been made for vacancies, the earnings to be derived from the ownership of the building, the amortization of the investment therein, and the payment of all expenses in connection with its operation including taxes on the building itself. In the land residual method of capitalizing income the return on the capitalization rate as well as the amount of amortization are charged against gross income as expenses of the building. The rate plus an anticipated tax rate is then used to capitalize the remaining income, which is regarded as attributable to the land.

The use of the land residual method is proper when the building is new and its cost is known and its value determined, and was the process employed by Nesser in finding a base rate land value of $4200 per front foot in the so-called 100 per cent business area. This base rate was also used as a base for establishing lesser values of land in other parts of the business district, such lesser values being based upon a site relationship percentage valuation to the 100 per cent business district. The land value for the plaintiff's property, Nesser stated, "was determined through co-relation and comparison of two land sales, residual land value capitalization of all property in the central business district where rent or lease information was known, of consideration of the

advice and recommendation of a citizens land value committee composed of local realtors, appraisers, bankers and owners."

The so-called "citizens land value committee" never recommended or approved the basic $4200 front foot valuation. Nesser never explained to them the manner or the calculations by which he had arrived at the $4200 per front foot valuation for the 100 per cent zone. Certainly they were unaware of his capitalization rate upon which this land valuation was computed. Its recommendation, if it has any value at all, merely related to the approval of a land map shown them by Nesser and was confined only to the site relationship of various parts of the business district to the 100 per cent district, rather than an approval of the 100 per cent valuation in and of itself.

The two land sales, one at 96 West Main Street in 1950 to the New Britain Federal Savings and Loan Association, and the other in 1953 at the corner of Main and Court Streets to the Savings Bank of New Britain, shed little, if any, light on the value of the subject property or the value of land in the 100 per cent zone. These purchases were made for the establishment or enlargement of banking facilities and are not market sales which are significant or comparable.

The defendant agrees that there are no sales of comparable property to that of the plaintiff's in the city. For many years no sales have taken place in the 100 per cent or even 90 per cent business district in New Britain. It is significant that an offer to sell the land and buildings of the New Britain Trust Company located in the center of the 100 per cent district at the corner of Main and Church Streets for the sum of $450,000 has found no buyer, although the offer has been on the market for more than a year.

It is also significant that the land upon which the building of the New Britain Trust Company stands is assessed on the list of September 1, 1956, on the basis of a fair market value of $430,292, with a building valuation in addition of over $500,000.

That there should be such a wide discrepancy between offers to sell and fair market valuations for assessment purposes calls for some scrutiny as to the method by which such valuations were ascertained. As already indicated, the method used was that of capitalization of stabilized net income by the land residual method as distinguished from other methods of capitalization of net income, such as building or property residual methods.

"The capitalized-income method of valuation refers to any procedure whereby the appraiser measures the value of the property by a calculation or estimate of the income or services derived or derivable from the property by its present or a potential owner. In its more usual form it involves a capitalization or discounted valuation of the realized or prospective net monetary income derivable by continuous exploitation rather than by resale. . . . This theory has been supplied by the 'capital-value' school of economics. It asserts that present value, like the cynic's concept of gratitude, is a mere anticipation of favors to come. * * * * Hence, the present value of the property is merely the present, discounted value of the anticipated net intakes or saved net outlays. The capital-value theory therefore furnishes the philosophy for the capitalization-income method of appraisal. It suggests that if the appraiser can predict the income derivable from the property and can apply appropriate discounts for interest and for risk of non-performance, his resulting valuation of the anticipated income is, ipso facto, a valuation of the property." 1 Bonbright, Valuation of Property, pp. 230, 231.

In essence, the theory of value underlying the capitalization of net income method of appraisal is that a stabilized annual net income, received over the economic life of the building, is in effect an annuity which is capitalized (or bought) on the basis of standard annuity tables and paid for like any annuity. However, not all net incomes to be received in the future are as certain of being received as is an annuity bought and paid for from some first grade life insurance company. And while Bonbright indicates that statistical data is fragmentary, some writers have expressed the opinion that investors tend to underdiscount the hazards of risky investments and there is no mathematical certainty in the preciseness with which figures relating to capitalization of net income are set forth. 1 Bonbright, op. cit., p. 260.

All authorities advise that extreme caution must be used in the application of the capitalized income method for determining market value, since a variation of one dollar, more or less, in the net income, when divided by the capitalization rate can produce variations ten, fifteen and twenty times the amount of one dollar in the capitalized value. Hence, the proper use of this method depends almost entirely upon the experience and judgment of the appraiser. The judgment of the appraiser must be fixed upon every element that goes into the final result: The determination of probable gross income after deducting probable vacancies; the estimated future expenses of the building; the period of amortization; depreciation or recapture of capital; and the return on invested capital in the light of other investments than real estate which are available and which may be safer and more liquid and more certain as to return of principal and payment of interest. A variation in any of these items produces large variations in the ultimate conclusion as to value.

In this whole process the vital factor is the capitalization rate. In addition, of great importance is the selection of a proper method of depreciation, amortization or recapture of investment in the building. The capitalization rate is the percentage figure used to evaluate an income flow and convert it into a capital amount. It is different from an interest rate in that it does not reflect the return on debt but reflects what investors demand for their investment and equity ownership. It should reflect market conditions. The capitalization rate should reflect the risk of continued stability of the net income over the economic life of the building, such stability being impossible to foresee except under a long-term lease guaranteed by the highest authority.

"An income valuation must proceed by successive stages; namely, the determination first of the probable gross income and its characteristics as to quality; second, the losses from vacancies; third, the expenses and operating outgo and the characteristics of these; fourth, capital charges, particularly sinking fund or other method of replacement (straight-line depreciation); and finally, the translation of the net income into a capital amount justified by the characteristics of that income and the general investment conditions. The capitalization rate is a numerical factor by which net income is converted into capital value by a simple arithmetical computation. The precise determination of that numerical factor requires broad experience and astute judgment. While this rate cannot be determined until the absolute net income figure has been established, nevertheless, the most preliminary work on gross income coincidentally involves elements of important influence on the capitalization rate. Thus while studying all of the various steps toward a valuation, whether it be gross income, expenses, futurities, reproduction cost or what, there must be a con-

current building up of factors that will ultimately influence the determination of this capitalization rate." Kniskern, Real Estate Appraisal Valuation, p. 325; National Assn. of Assessing Officers, Urban Land Appraisal, p. 47; May, Valuation of Residential Real Estate, p. 195; Knowles, Real Estate Appraisal Manual, p. 36.

"The probabilities of the future are reflected in the projection of the net income and/or the rate of capitalization. Where there are long-term leases of exact dollar value amply secured we can estimate. But there comes a time when it is impossible to estimate with reasonable accuracy. In the absence of well secured leases any attempts to set out gross income beyond two or three years leaves the zone of precision for that of general judgment and such judgment can better be expressed through the capitalization rate." Kniskern, op. cit. supra, p. 354.

"The rate of capitalization ultimately selected for use by the appraiser cannot be the result of an arbitrary judgment on his part; rather, it is a reflection of the current, well informed, conservative public judgment or rating as expressed in comparable investment transactions and long-term investments having characteristics similar to those found in the property under appraisal." Id., p. 399. For such comparisons we have a primary base in the ideal investment which has these characteristics: (1) Absolute security of principal; (2) liquidation of principal at the will of the investor without shrinkage; (3) certainty and regularity of payment of interest; (4) no supervision or effort required on the part of the investor to protect or collect interest or principal payment; and (5) no offsets against income. Other characteristics are availability for collateral, tax exemption, etc. Id., p. 400.

Submitted in evidence were quotations of long-term United States treasury bonds, public utility

bonds, railroad equipment bonds, and various common stocks, both national and local. From this evidence a comparison could be made of the rate of return of 5.5 per cent established by the defendant, on Nesser's recommendation, in arriving at its fair market value determination of the land valuation of $4200 as a base front foot rate in the 100 per cent business district.

In addition to the rate of return, the method of amortization, depreciation or recapture of capital, as the terms may be used interchangeably, must also be decided upon. The evidence indicated that the method for amortizing investment prevailing in the locality was the straight-line method. This method provides for the withdrawal of an equal amount each year over the economic life of the building. As against this method, there is the annuity method of depreciation which sets up a sinking fund for a period covering the economic life of the building for the replacement of the building. The annuity method assumes that the net income will grow no less and will remain constant, or at least equal it in average, over the economic life of the building. From evidence submitted, the court finds that the straight-line method of depreciation should have been employed. Knowles, Real Estate Appraisal Manual, p. 35.

The defendant, through Nesser, employed the annuity method called the Hoskold, as distinguished from the Inwood, method of depreciation. The Hoskold method provides for the transference of a fixed amount each year into a sinking fund, there to be compounded at a 3.5 per cent rate and remain untouched until the end of the amortization period. At the end of such period, in this case fifty years, the investment would then be available for replacement of the building if desired. The percentage of 0.76 per cent per annum on this basis of depreciation as

against 2 per cent per annum on the straight-line method over a fifty-year period as a charge against the building obviously resulted in a larger net income available for land valuation and, therefore, a higher per front foot valuation.

Appraisal should deal with facts to be found in the market place. The prevailing method of depreciation or recapturing capital invested in the purchase of real estate in New Britain on the date of the assessment, September 1, 1956, was made on the straight-line method, where the amortization is over such a long period of time. The straight-line method takes into consideration a decreasing income over the economic life of the building. This is logical in view of the physical depreciation of any building. The straight-line method also provides for a return of investment more rapidly in the earlier years of ownership than in the later years. The annuity method provides for a slower recovery of capital in the earlier years and a greater accumulation in the later years. While theoretically a larger interest return might be earned over such period of time under the annuity method, investors are influenced by a desire to recapture investment in the early years, when the property is likely to be more productive, especially when a purchase is based on the projection of income over a long period of time in the future.

Besides a comparison of real estate investment returns with other forms of investment available in the market, there is another method of ascertaining the capitalization rate of return. This method is known as the so-called "band of investment" theory. Knowles, Real Estate Manual, p. 23; Kniskern, Real Estate Appraisal & Valuation, pp. 476, 478. The rate of return is usually fixed with relation to the return upon the entire fee. It can also be computed on the basis of prevailing rates with respect to first mort-

gage financing and rates of return upon equity holdings or second mortgage financing.

On September 1, 1956, the prevailing rate of interest required to be paid to obtain first mortgages upon property such as the subject property was 5.5 per cent per annum. The prevailing mortgage coverage would not exceed between 50 to 60 per cent of the valuation or the fair market value of the property so mortgaged. Assuming a hypothetical 60 per cent mortgage on the subject property, or property in the $4200, 100 per cent business district, at 5.5 per cent interest, and assuming an approximately 9 per cent equity return, which is reasonable in view of the risk involved, upon the remaining 40 per cent equity holding, the combined percentage would be 7 per cent upon the fee. Thus:

$$
\begin{array}{llcl}
5.5\% \text{ of } 60\% \text{ mortgage} & = & 3.3\% \\
9.25\% \text{ of } 40\% \text{ equity} & = & 3.7\% \\
\hline
& \text{Total} & & 7.0\%
\end{array}
$$

An 8 per cent equity return would make a total return on the fee of 6.5 per cent, while a 10 per cent equity return would make a total return on the fee of 7.3 per cent.

It is interesting to note that this "band of investment" theory was used by Nesser to justify the capitalization rate of 5.5 per cent used by the defendant. In another case heard by the court, Nesser testified that his 5.5 per cent rate was based on the band of investment theory. He assumed that on September 1, 1956, a 4.5 per cent mortgage covering 80 per cent of the valuation of the property could be obtained. He was willing to allow a 10 per cent return to the owner of the remaining 20 per cent. He thus arrived at a 5.5 per cent return on the fee as follows:

4.5% of 80% mortgage   =   3.6%
10%   of   20%   equity   =   2.0%

    Total      5.6%
    Rounded to    5.5%

There was no credible evidence, in this case, that on September 1, 1956, such mortgages were obtainable. On the contrary, there was evidence that no bank or insurance company could make a loan of such coverage. There was evidence that no such rate as 4.5 per cent prevailed at the time.

On the basis of comparison with other investments available on September 1, 1956, and on the band of investment theory, it is difficult to ascertain exactly how the 5.5 per cent return used by the defendant can be justified as the prevailing rate for capitalization of net income on September 1, 1956.

The land residual study of premises at 277-279 Main Street, in which the Lerner shops are located on a thirty-five-year lease commencing in 1951, resulted in a front foot value of those premises of $4164.26 as a base rate. Putting aside the query at this time whether depth tables should or should not be employed at all, the court finds that this study and analysis was a contributing factor in the establishment of the $4200 per front foot base rate which is the foundation for the land valuation of the plaintiff's property. Were a hypothetical building, costing the same amount as was allocated in the study of the Lerner property, to be erected on the same size parcel as the Lerner building, and having a value of $4200 a front foot, and with the same deductions for expense of operation of the building and the same capitalization rate, the variations between such hypothetical building and the Lerner building in precise figures would be so slight as to be of no consequence. The difference of less than 1 per cent in the basic front foot rate, as well as other comparisons

relating to amount of income assigned to the building, and the amount of income available for land capitalization are almost identical. Hence, the conclusion that the $4200 per front foot base rate which was established for the 100 per cent business district in New Britain resulted from substantially the capitalization of the same net income as the land residual study of the property at 277-279 Main Street revealed is reasonable, especially since the actual fair market value of the Lerner property on a 100-foot depth basis was $4003.63 on September 1, 1956, an adjustment downward from the $4200 base hereinbefore described.

Thus:

HYPOTHETICAL BUILDING

Computed on effective lot size 42' x 220'

| | | |
|---|---|---|
| Gross rental per year | | $30,150.00 |
| Owner pays insurance, taxes and exterior repairs | | |
| Actual building cost   $122,117 | | |
| Cost to own building | | |
| Interest | 5.50% | $6,716.00 |
| Taxes | 2.50% | 3,053.00 |
| Insurance | 0.35% | 427.00 |
| Maintenance | 1.00% | 1,221.00 |
| Amortization | 0.76% | 928.00 |
| Contingencies | 0.25% | 305.00 |
| | | $12,650.00 |

Balance imputable to land ............ $17,500.00

Capitalization Rate Interest 5.5%
  Tax 2.5%
Capitalization value of land .......... $218,750.00
Effective lot size 42' x 220'
Actual front foot rate ............... $5,208.00
Depth factor 1.24
Base front foot rate ............... $4,200.00

An analysis of this study indicates the deficiencies and defects which exist in the establishment of the $4200 a front foot base rate. The net income allocated to the building is insufficient. No vacancy or management allowance has been made in the expenses chargeable to the building. Such allowance should have been made as a long-term lease of fifty years ought not to have been assumed on a hypothetical basis. Since we are projecting future income, it is but a common caution to deduct from gross income some percentage for vacancies, and to include in expenses some allowance, usually 5 per cent, for management.

In addition, a capitalization rate, including a return of only 5.5 per cent, is inadequate in the light of returns available on September 1, 1956, upon more liquid and safer investments such as government bonds, public utility stocks, bonds and high grade common stocks. Moreover, such a low return is not justified under market conditions prevailing on September 1, 1956, under the band of investment theory described above.

The recapture of capital or depreciation based on the Hoskold annuity method allowing 0.76 per cent of the gross income to be paid into a sinking fund over a fifty-year period, there to be compounded at 3.5 per cent, is not a realistic approach compared to the straight-line method of depreciation, which recognizes a decrease in earning power as the building gets older.

The projection of the economic life of the building over fifty years is also a risk which must be compensated for in the capitalization rate. Actually a 5.5 per cent return amortized over a fifty-year period under the Hoskold annuity method is less than a 5 per cent return for the same period of time on the straight-line method. If amortization were computed

on a forty-year straight-line method, the 5.5 per cent return would be decreased and would be not much greater than the return on a long-term government bond. A comparison between the risk involved in an investment in a long-term government bond and an investment in real estate even in the 100 per cent area is obvious in so far as liquidity alone is concerned, to say nothing of security of income and principal. These considerations alone should have given rise to a selection of a proper capitalization rate by the defendant.

Under mortgage rates prevailing on September 1, 1956, a 5.5 per cent return on the fee would actually be not more than a 5.5 per cent return on an equity holding. Thus:

$$
\begin{array}{llll}
5.5\% \text{ of } 60\% \text{ mortgage} & = & 3.3\% \\
5.5\% \text{ of } 40\% \text{ equity} & = & 2.2\% \\
\hline
\text{Total} & & 5.5\%
\end{array}
$$

The absurdity that the equity holder as an investor would be satisfied with a return no greater than that of the first mortgagee is apparent. No such investment would ever be made by a purchaser, if his return were no greater than that of the interest return to a far better secured first mortgagee.

In finding a land valuation upon which a $4200 per front foot base rate was computed, all of these matters should have been, but were not, given proper consideration. The outer bounds of land valuation were apparently striven for. A long-term lease with twenty-eight years still to run and projected to fifty years was made the prototype of all rentals in the 100 per cent business area; a prime tenant was assumed; no allowance for vacancies over a fifty-year period was made, nor was a cent allowed for payment of management costs over such period. A return of 5.5 per cent per year was the rate allowed to an in-

vestor over a fifty-year period, which amounted to less than 5 per cent, if the straight-line method of depreciation was used, and amounted to less than 5 per cent if any vacancy occurs during such period. Under the Hoskold annuity method of amortization employed by the defendant, the assumption was made that the gross income over the period of the economic life of the building derivable from a hypothetical building constructed on a $4200 per front foot parcel was a minimum amount of income to be obtained and that such income would be higher, but there is nothing in the evidence to justify such an assumption. Taxes, insurance and maintenance are assumed at present costs and no allowance is made for increases. Thus the highest possible net income was allocated for land capitalization which, when such net income was capitalized at the low rate of return of 5.5 per cent, produced the highest possible land valuation. This land valuation was then reduced to a basic front foot rate by the use of depth table percentages which further distorts land values. May, Valuation of Residential Real Estate, p. 298; Kniskern, Real Estate Appraisal Valuation, pp. 273, 281, 283. Upon such assumptions was a market value of $4200 established for the 100 per cent business zone.

In projecting the future, prophecy is always risky and some caution must be exercised. The very premise that this area will remain a 100 per cent business zone, taking into consideration the existing trends to suburban shopping centers, is involved. Impossible as it is to foresee the exact gross income and building expense over such a long period of time, and thus the exact net income stabilized in precise dollars available for land capitalization, this caution must be and should have been exercised through the capitalization rate. This the defendant city through its revaluation expert failed to do. Values are not created by depth tables. They are created from the capitaliza-

tion of net income, if this method is employed, by a rate of return arising out of the market place itself.

There was testimony that the rate of return which a willing purchaser would expect to receive in purchasing property similar to the subject property ranged from 7 to 12 per cent. At a 6.5% return, using the straight-line method of depreciation, the evidence indicated that the base front foot rate of the 100 per cent business district would be about $3146, and that the actual front foot rate of the subject property would be about $3000, and the total value of the property, including passway rights, would be approximately $138,500. At a 7 per cent return, using the straight-line method of depreciation, the evidence indicated that the base front foot rate of the 100 per cent business district would be about $2869, and that the actual front foot rate of the subject property would be about $2710, and that the total value of the property, including passway rights, would be approximately $125,000. At a 7.3 per cent return on the straight-line method of depreciation, the base front foot rate of the 100 per cent business district would be about $2700, and the actual front foot rate of the plaintiff's property would be about $2553, with a total land value of the plaintiff's property, including passway rights, of approximately $118,000. At an 8 per cent straight-line method of depreciation, the value of the plaintiff's property on this method of capitalizing net income, including passway rights, would be approximately $102,000. This computation is based on a 45-foot frontage as claimed by the city rather than a 43.5-foot frontage as claimed by the plaintiff.

Based on the evidence and a personal inspection of the premises by the court, and its own general knowledge of the elements going to establish value, and giving due consideration to the various methods upon which testimony was offered for determining

market value, the court finds that the fair market value of the plaintiff's land, including passway rights, on September 1, 1956, was $130,000, and further finds that the plaintiff has been aggrieved by the action of the board of tax review of the defendant in failing to reduce the assessment made on the plaintiff's land on the list of September 1, 1956.

Since the actual tax assessment is based on 60 per cent of the fair market value, judgment may enter in favor of the plaintiff reducing the tax assessment on the list of September 1, 1956, of the plaintiff's land from $109,719.60, being 60 per cent of $182,866, to $78,000, being 60 per cent of $130,000, the fair market value, together with costs.